EDWARD K. CHAPMAN

*vs.*

NEW YORK CENTRAL RAILROAD COMPANY.

Cumberland County. Decided January 28, 1919. The plaintiff alleges that he lost the sale of part of a car load of Christmas trees through the wrongful interference of the servants of defendant. The defendant pleaded by brief statement "That the acts complained of were caused by the enforcement of quarantine regulations of the State of New York and were not caused by any fault of the New York Central Railroad Company." The plaintiff has a verdict which defendant moves to set aside on the usual grounds. The motion must be sustained.

Prior to the month of December, 1915, a quarantine against the gypsy moth had been established by the New York Department of Agriculture, and was then in force, upon certain towns in Maine and other New England states, prohibiting the shipment into or reception at any point within the State of New York from the quarantined area, of certain coniferous trees including the class commonly known as Christmas trees; and the officials of the New York Central Railroad Company had been instructed by an officer of the department having charge of the enforcement of the quarantine in New York City, to notify his office of all cars received from New England and northern New York, and hold them until notified by his office to release them to the consignees. These instructions seem to have been given regardless of the limits of the quarantined area in New England, to guard against trees cut within the infested area and shipped from a point outside that area.

On December 11, 1915, the plaintiff shipped to his own order from Oquossoc, Maine, to New York City a car load of Christmas trees. The interline way-bill issued by Maine Central Railroad Company, which accompanied the car, stated the shipment as from Brunswick, Maine, to 60th Street, New York, N. Y.; on that way-bill in the column headed "Consignor, Connecting line Reference, Original Car & Way-bill Number and Point of Shipment," these words, "Oquossoc, Me.," appear. The bill of lading issued by the Maine Central Railroad Company and delivered to the shipper stated that the car was

received at Oquossoc, Me.   The car arrived at the Thirty-third street station of the defendant in New York on December 22 or 23; about 9 or 10 o'clock in the forenoon of December 23 the plaintiff presented the bill of lading, paid the freight and received a paid freight bill; upon presenting the paid freight bill to the delivery clerk he received from the latter a delivery slip; the delivery clerk warned him not to touch the car until one of the inspectors had passed on it. The plaintiff however took possession of the car and began to unload it.

Between three and four o'clock in the afternoon of the same day information of the car, that it came from Brunswick, Maine, within the infested area, was telephoned from a freight office of the defendant to Mr. Sands, of the New York Department of Agriculture, having charge of the enforcement of the quarantine in New York City; Mr. Sands at once instructed one Kennedy, an inspector of the department "to locate Mr. Chapman and provide inspection for that car; and if on the data furnished by the railroad it could not be determined whether the car originated in the moth infested area, or outside of the moth infested area, to accept an affidavit in lieu of such inspection and release the car on that." .

   Q.   What kind of an affidavit?   A.   An affidavit by Mr. Chapman to the effect that the trees loaded on that car were cut outside of the moth infested area.

Mr. Kennedy at once found Mr. Chapman and told him that the car was held subject to release by the Department of Agriculture, that it showed billing from Brunswick, within the quarantined area, and said to him that if he would make an affidavit that the trees were cut outside the infested area, the department would release the car. The plaintiff refused at first to make the affidavit, claiming that he could not personally say that the trees came from Oquossoc, but that the bill of lading would show that fact; later he said that the would make the affidavit, if Mr. Kennedy would bring a notary to him. He persisted in unloading and selling the trees.   Mr. Kennedy then told one McBreen, who was in charge of the yard, that the car was held subject to instructions from the department and to stop the plaintiff from unloading it, which he did.   Thereupon the plaintiff said to McBreen and his men, "I surrender these trees to you as a sale, and it is a good sale, too" and soon after left the yard; and his testimony is, that thereafter he did not "go near the railroad in any way, the railroad officials, or try to look up" Mr. Kennedy.

Mr. Sands testifies: "Mr. Kennedy returned to me at 10.30 December 24th, with a copy of the way-bill, and evidence that the explanation by the railroad agent to him was that it originated outside of the moth infested area." He further says: "I didn't put any burden of proof on the railroad to show whether the car originated in the moth area or not. It was for me to determine, and I ordered the car released. I didn't leave that question to the railroads." The railroad company was at once notified that the car could be delivered, and effort was made to find Mr. Chapman during that day, both at the railroad yards and at his hotel; the inspector also endeavored to get in touch with him by telephone at his hotel, on the evening of the 23d.

This rather extended analysis of the evidence has been made, to show clearly that upon these facts, which are undisputed, but one inference can legally be drawn,—that the plaintiff lost his trees through his own wilful and persistent disregard of the reasonable regulations of the New York Department of Agriculture; his attitude is clearly reflected by his testimony printed in the record. The jury must have misapprehended the issue, and thus erred. The mandate must be: Motion sustained. Verdict set aside. New trial granted. *Clifford E. McGlauflin, and William Lyons*, for plaintiff. *Symonds, Snow, Cook & Hutchinson*, for defendant.